U. S. DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
RECEIVED- LAFAYETTE

MAY 16 2012

TONY R. MOORE, CLERK
BY _____ DEPUTY

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

| | |
|---|---|
| **GRAHAM** | **CIVIL ACTION NO: 65-11053** |
| vs. | **TUCKER L. MELANÇON** |
| **EVANGELINE PARISH SCHOOL BOARD, ET AL.** | |

## JUDGMENT

Before the Court is a Motion For Declaration of Unitary Status And To Dismiss [Rec Doc. 382] filed by defendant, Evangeline Parish School Board. The Original Plaintiffs and the Government have each filed Responses stating that they have no objection to the Motion. [Rec. Docs. 386, 387]. For the reasons that follow, the Court will grant the motion, dissolve the permanent injunction issued by the Court on August 5, 1969, vacate all other orders entered by the Court in this proceeding and end its direct supervision of the School Board immediately.

## I. BACKGROUND

The long and convoluted history of this 47 year old case has been thoroughly set out in the Court's September 1, 2004 Ruling found at *Graham v. Evangeline Parish Sch. Bd.*, 223 F.R.D. 407, 417-431 (W.D.La.2004), and will not be repeated here. On December 22, 2009, the Court entered a Consent Order which, *inter alia*, granted unitary status as to transportation, extra-curricular activities and staff assignment and dismissed the permanent injunction as to those areas of operation. [Rec. Doc. 356]. The School Board now moves the Court for a declaration of unitary status and to dismiss with respect to the areas of student assignment, facilities, and teacher assignment, contending that it has successfully operated the Evangeline Parish School System ("the School System" or the "District") in a unitary manner, fully

compliant with the relevant decree provisions entered in this matter, and has thereby eliminated, to the extent practicable, all remaining vestiges of past desegregation in the District. The attorney for the Original Plaintiffs and the School Board have advised the Court that they have resolved the issue of the attorney's fees due Original Plaintiffs' attorney under controlling jurisprudence and that it is not an issue that need be addressed by the Court.

## II. LAW AND ANALYSIS

When first presented with a school desegregation case, a district court is charged with determining whether or not a school board has maintained or facilitated a dual school system in violation of the Equal Protection Clause of the United States Constitution. *U.S. Const., Amend. XIV*. If the district court finds such a violation, then under *Brown v. Board of Educ. of Topeka, Shawnee County, Kan.*, 347 U.S. 483 (1954), and *Brown v. Board of Educ.*, 349 U.S. 294 (1955), the dual system must be dismantled, and the school board must "take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch." *Green v. County Sch. Bd. of New Kent Cty., Va.*, 391 U.S. 430, 437-38 (1968).

Neither a school board's nor a district court's duty ends with the initial desegregation order. Rather, there is a "continuing duty [for school officials] to eliminate the system-wide effects of earlier discrimination and to create a unitary school system untainted by the past." *Ross v. Houston Indep. School Dist.*, 699 F.2d 218, 225 (5th Cir.1983) (citing *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15 (1971)). Likewise, the district court "retain[s] jurisdiction until it is clear that state-imposed segregation has been completely removed." *Id.* (citing *Green* at 439; *Raney v. Bd. of Educ.*, 391 U.S. 443, 449 (1968)).

The ultimate goal in every desegregation case is to eliminate from each aspect of school operations the vestiges of past segregation to the extent practicable and, thus, achieve unitary status. *Freeman v. Pitts*, 503 U.S. 467, 489 (1992). Because federal court supervision of a local school system is intended to be a temporary measure only, it is the district court's duty to return "schools to the control of local authorities at the earliest practicable date." *Id.* Therefore, a federal court's supervisory authority must not extend beyond the time that unitary status has been achieved, i.e. the effects of past discrimination have been remedied. *Board of Educ. of Oklahoma City Pub. Sch. v. Dowell*, 498 U.S. 237, 248 (1991).

The Court must examine three (3) factors in order to determine whether unitary status has been achieved: (1) whether the school district has fully and satisfactorily complied with the court's desegregation orders for a reasonable period of time; (2) whether the school district has eliminated the vestiges of past *de jure* discrimination to the extent practicable; and (3) whether the school district has demonstrated a good faith commitment to the whole of the court's order and to those provisions of the law and the Constitution which were the predicate for judicial intervention in the first instance. *See Missouri v. Jenkins*, 515 U.S. 70, 87-89 (1995); *Freeman* at 491-492; *Dowell* at 248-250. The Fifth Circuit has held that operating in a unitary fashion for a period of three years without circumstances adverse to desegregation is adequate to demonstrate the establishment of unitary status. *Dowell* at 248; *see also Flax v. Potts*, 915 F.2d 155, 158 (5th Cir.1990); *Monteilth v. St. Landry Pub. Sch. Bd.*, 848 F.2d 625, 629 (5th Cir.1988).

Under *Green*, six areas of operation must be free from racial discrimination for the requisite period before full unitary status is achieved: (1) student assignment; (2) physical

facilities; (3) transportation; (4) extracurricular activities; (5) teacher assignment; and (6) staff assignment. The district court may find that a school board has reached partial unitary status on one or more factors. *Freeman at 489*. A school board "bears the burden of showing that any current imbalance [in these areas] is not traceable, in a proximate way, to the prior violation." *Id. at 493*. As the School System was previously found to have achieved unitary status in the areas of transportation, extra-curricular activities, and staff assignment, R. 356, the School Board presently has the burden to support a declaration of unitary status for the remaining *Green* factors of student assignment, physical facilities, and teacher assignment by demonstrating, as to each specific area, that it has complied in good faith with the orders of the Court and has been operating in a unitary manner for the requisite period thereby eliminating the vestiges of past discrimination to the extent practicable. *Dowell*, 498 U.S. at 249-250. The Court must examine the evidence of compliance and the desegregative effect thereof. *See Manning v. School Bd. of Hillsborough County*, 244 F.3d 927, 940 (11th Cir.), *cert. denied*, 534 U.S. 824 (2001)(unitary status is a finding of fact). Once the Court determines that the facts reveal no continued racial discrimination and the School Board's good faith to maintain such nondiscriminatory practices, it may declare the subject area unitary. *Freeman* at 490-491; *see also Price v. Austin Indep. Sch. Dist.*, 945 F.2d 1307, 1314 (5th Cir. 1991)(We use the term "unitary" to refer to a school district that "has done all that it could to remedy the [prior] segregation caused by official action.").

> A. **The Remaining *Green* Factors:
> Student Assignment, Physical Facilities, and Teacher Assignment**
>
> 1. **Student Assignment**

On December 22, 2009, the Court entered a Consent Order which provided that the

School System could be declared unitary in the area of student assignment if, for school years 2009-2010, 2010-2011, and 2011-2012, the School Board, in good faith, implemented the particular provisions of the plan set forth in the order. *R. 356, 2009 Consent Order, pp. 8-22.*

The Court finds that the School Board has accomplished the full implementation of the Consent Order provisions.

### a. Attendance Zones and Residency Verification.

It is undisputed that the School Board has strictly enforced the attendance zone lines set by the School Reorganization Plan of March 1, 2004. *Id., Attendance Zones,¶ II (A)(2),p. 8* . The zones were enforced by a consistent application of residency verification, each student was enrolled in and attended the proper school in the zone of his legal residence, excepting only those students who obtained a permissible transfer, and students were assigned to classes without regard to race and in such a manner that no assignment was made in a discriminatory manner or with a discriminatory result. *Id., ¶ II(A)(1), (3), (4), pp. 8-16;* R. 382, Exh. A.

### b. Student Transfer Policy

It is also undisputed that the School Board has allowed students to transfer from the school of their residence to another school in the System only if the transfer was based upon one of the reasons included in the Consent Order and only if these procedures for application and approval were properly followed. In order to reach that goal, the School Board instituted the following measures: (1) The District's Desegregation Compliance Officer served as the co-ordinator of all transfers, including overseeing the majority-to-minority transfers; (2) All required notices to students and parents as well as all required public advertising of the majority-to-minority policy were accomplished; and (3) All required reports regarding transfer

data were regularly submitted to the Original Plaintiffs and the Government's counsel, wherein concerns were addressed and clarifications made, when necessary, but no violations were noted. *R. 382, Exh. A, Student Assignment, Student Transfer Information, pp. 9-13*.

### c. Magnet Programs and Advanced Placement Classes

The record indicates, and it is undisputed, that the School Board continued the magnet programs and advanced placement classes at Ville Platte High School ("VPHS") and the magnet program at Pine Prairie High School ("PPHS") as required under the 2009 Consent Order[1]: (1) students at VPHS were offered every course that was offered at other high schools in the System; (2) the advanced placement/honors classes offered at VPHS were not offered at other District high schools; and, (3) the advanced placement courses were registered with the College Board Advanced Placement Association and all students in those courses were given the opportunity to take the respective AP exams. *R. 372-1, 2011 Report; R. 363-2, 2010 Report*.

### d. Analysis of Student Assignment

The 2004 Reorganization Plan included enrollment projections that, if realized, would provide an acceptable racial ratio within student bodies in all schools in the System. *R. 111; 134*. Thereafter, the School Board implemented the provisions of the 2009 Consent Order which provided direction in managing the assignment of students in the District to achieve the enrollment projections. *R. 356*. The record provides undisputed evidence that the School Board's implementation of the Consent Order resulted in a District-wide racial make-up which

---

[1] The School Reorganization Plan approved by the Court on March 25, 2004, required that a medical science academy be added at VPHS beginning with the 2005-06 school year. *R. 111; 134*.

has remained within 1 point of the Reorganization Plan's predicted ratios every year since 2004. *R. 382, Exh. A, Analysis of Student Enrollment Data 2009-2010 through 2011-2012, p. 2; Id. at Exh. B, Analysis of Student Enrollment Data 2004-2005 through 2008-2009, p. 1.* Although subtle but demonstrable changes in the racial make-up have occurred at each school in the System, over the past three (3) years the student enrollment data reveals a positive impact on desegregation, e.g. the African American population increased at Basile High School from 15% to 20% and at W.W. Stewart from 18% to 22%; the Caucasian population increased at James Stephens Montessori School increased from 41% to 46% and at Ville Platte High School from 20% to 24%. *Id.*

As the only remaining concern related to student assignment in 2009 was that VPHS continued to have an enrollment that was racially identifiable, the 2009 Consent Order required the implementation of additional measures specific to VPHS. The record is undisputed that the School System has taken every step practicable to create a more diverse student body at VPHS by instituting magnet programs and advanced placement classes, providing instructors for the math and science magnet programs who all hold Masters degrees or above, and by substantially improving the VPHS facilities.

While the enrollment statistics at VPHS demonstrate a relatively static enrollment ratio and the District-wide data shows that some of the schools continue to be outside the desirable African American-Caucasian student ratio range, the existence of a few such schools does not preclude a finding that the School Board has satisfied its obligation to eliminate the vestiges of *de jure* segregation *to the extent practicable* (emphasis, that of the Court). *Freeman*, 503 U.S. at 494; *Price v. Austin Indep. Sch. Dist.*, 945 F.2d 1307, 1314 (5th Cir. 1991). There is

no evidence that any of the schools in the District became racially identifiable for any other reason than the private choices in residential patterns and in sending children to private versus public schools. Racial imbalance arising from such choices is not, as a matter of law, a vestige of discrimination that a school board must eliminate. *Flax*, 915 F.2d at 161-62. Nor should a Court employ measures "to achieve racially balanced school assignment 'in the late phases of carrying out a decree, when the imbalance is attributable neither to the prior de jure system nor to a later violation by the school district but rather to independent demographic forces.'" *Hull v. Quitman County Bd. of Educ.*, 1 F.3d 1450, 1454 (5th Cir. 1993) (quoting *Freeman* at 493)).

As the School Board has effectively eradicated any vestige of past discrimination in the area of student assignment and has maintained such nondiscriminatory policies for more than three (3) years, the Court finds that the School Board is unitary in the area of student assignment.

### 2. Physical Facilities

A school district's physical facilities should be deemed unitary when the school board has ensured, to the extent practicable, that its facilities are not amenable to racial identification simply on the basis of their physical condition. *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 18 (1971). The Court previously determined that, as of December 2009, the School Board had met unitary requirements for all District facilities except those constituting the Ville Platte High School campus (VPHS). *Rec. Doc. 356, 2009 Consent Order, p. 22.* Since the adoption of the 2004 Reorganization Plan, the School Board undertook a plan of renovations at VPHS which encompassed virtually all aspects of the school and its facilities,

including those mandated in the 2009 Consent Order. The School Board expended $2,736,450.80 of general fund dollars on construction and renovations at the campus from 2004 through 2009. In addition to these expenditures, as of the date of the filing of the motion at bar, the School Board completed all improvements mandated by the 2009 Consent Order at a cost $3,314,959.00. *R. 382, Exh. C, Physical Facilities*. Based on the record as well as the Court's own on-site observations, the expenditure in excess of $6,000,000 has resulted in a positive, significant improvement in the educational environment at the campus, and VPHS now offers, in the Court's view, based on its on-site observation and knowledge of each school in the District, as good as, if not the better educational environment than any school in Evangeline Parish operated by the School Board. *R. 382-1, Exh. C, photographs*. The Court finds that the School Board has met its constitutional obligations with regard to facilities and is therefore unitary in the area of facilities.

### 3.     Teacher Assignment

In 2009, the Court granted the School Board unitary status in the area of staff assignment, leaving only the assignment of classroom teachers to be monitored for unitary operation. *R. 356, Consent Order pp. 7-8*. The 2009 Consent Order provided that the School Board could move for unitary status after the 2010-11 school year in the area of teacher assignment if certain provisions were implemented for the 2010-2011 school year. *Id. at pp. 18-22*. Pursuant to the provisions of the Consent Order, teachers were actively recruited and employed which resulted in racially diverse faculties at every school. *R. 363, 2010 Report, pp. 1-19; R. 372-2, 2011 Report, pp. 1-18; R. 382, Exh. E, pp. 1&2*. Thus, the uncontradicted evidence indicates that the School Board has engaged in nondiscriminatory assignment of

faculty and administrative staff that has effectively eradicated any vestige of past discrimination with regard to teachers and has consistently maintained and implemented such nondiscriminatory policies and practices for more than three years. The Court finds that the School Board is unitary in the area of teacher assignment

### B.     Bi-Racial Committee

The 2009 Consent Order set out certain requirements related to the re-establishment of a Bi-Racial Advisory Committee and to reporting. The School Board has complied with the requirement that it re-establish an independent Bi-Racial Advisory Committee and the provisions relevant thereto. *R. 363-3, 2010 Report, pp. 22-28.*

### C.     Demonstration of Good Faith

The Court's findings with regard to the three *Green* factors set out above, as well as the Court's previous findings related to transportation, extra-curricular activities, and staff assignment, constitute outward signs of the School Board's good faith commitment to the entirety of the desegregation plan so that the students, parents, and the public have assurance that further injuries or stigma will not occur. *Freeman, 503 U.S.* at 498. The School Board has demonstrated its good faith not only through "its policies [which] form a consistent pattern of lawful conduct directed to eliminating earlier violations," *Id.*, but also through its continued commitment to fulfilling the orders of this Court and its obligations to desegregate to the extent practicable.

Having fully reviewed the record of this matter, and being intimately familiar with the history of this proceeding, as the presiding judicial officer since September 17, 1996, the undersigned finds that the School Board has demonstrated its good faith commitment to the

Court's orders and to the entirety of the desegregation plan so that its students, employees and the public have assurance that further injuries or stigma will not occur.

### III. CONCLUSION

For the foregoing reasons, the Court finds that the Evangeline Parish School Board has demonstrated that it has achieved unitary status in the remaining areas of student assignment, facilities, and teacher assignment; has exhibited good faith in achievement and maintenance of such non-discriminatory programs; and is prepared, willing, and ready to move forward in a constitutionally consistent manner without direct judicial supervision. Accordingly, it is therefore

**ORDERED** that the Evangeline Parish School Board's Motion For Declaration of Unitary Status And To Dismiss is **GRANTED**, the permanent injunction entered on August 5, 1969, is **DISSOLVED**, all other orders issued by the Court in this proceeding are **VACATED**, and the Court's direct supervision of the School Board is **ENDED**, effective immediately.

**THUS DONE AND SIGNED** in Lafayette, Louisiana, this 16th day of May, 2012.

_____
**Tucker L. Melançon**
**United States District Judge**